IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MAUREEN J. RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09-CV-323-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Maureen J. Richardson brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits and supplemental

security income under the Social Security Act.  On April 1, 2010, all parties consented to

entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon

review of the record and briefs submitted by the parties, the court concludes that the decision

of the Commissioner is due to be affirmed.

## BACKGROUND

On January 30, 2004, plaintiff filed applications for disability insurance benefits and

supplemental security income.  On July 15, 2005, after the claim was denied at the initial

administrative levels, an ALJ conducted an administrative hearing.  The ALJ rendered an

unfavorable decision on November 3, 2005. Plaintiff requested review by the Appeals

Council, which remanded the case for a new hearing on October 31, 2007.  The ALJ held a

new hearing and, on August 29, 2008, the ALJ concluded that plaintiff suffered from the following severe impairments: "history of nonepileptic seizure disorder, sleep apnea, migraine, degenerative disc disease/osteoporosis, obesity, carpal tunnel syndrome, adjustment disorder and depression/anxiety-related disorders." (R. 17). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform past relevant work as a sales clerk and also, that she could perform other jobs existing in significant numbers in the national economy. (R. 18, 33-34). Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. (R. 34). On February 12, 2009, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

2

attaches to the ALJ's determination of the proper legal standards to be applied. <u>Davis</u>, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. <u>Cornelius</u>, 936 F.2d at 1145-46.

## BACKGROUND

Plaintiff alleges that she has been disabled since September 21, 2003. (R. 68, 14). Between October 1998 and September 4, 2003 – before plaintiff's alleged onset date – Dr. Kevin Hornsby, plaintiff's treating physician, diagnosed plaintiff with, *inter alia*, migraine headaches (October 1998 and February 1999), knee pain (April 1999), obesity (April 1999 and September 2002), seizure disorder (September 2003), and depression (September 2003). (Exhibit 1F, R. 242-53). His treatment notes do not reflect any restrictions or functional limitations.

On October 2, 2003, Dr. Alan Prince, plaintiff's neurologist, noted that a seizure which was reported about one month prior occurred because plaintiff cut her Mysoline dosage from 500 mg a day to 375 mg a day. After returning to the 500 mg a day dosage, she was reportedly doing fine. Dr. Prince also reported plaintiff's major problem as sleep apnea syndrome and confirmed that plaintiff has a C-Pap machine but does not use it. He performed a C-Pap restudy and, on November 17, 2003, Dr. Prince reported her new C-Pap setting would be 11. He also noted that since returning to her normal dose of Mysoline plaintiff is no longer having any seizures (Exhibits 4F and 5F). An EEG performed on April 5, 2004 showed no abnormalities. (Exhibit 6F).

In June 2004, plaintiff underwent a psychological evaluation conducted by Dr. Doug McKeown at the request of the state agency and a consultative physical examination by Dr. Sam R. Banner. (Exhibits 7F, 8F). Dr. McKeown stated that plaintiff appeared capable of maintaining activities of daily living and personal hygiene. He diagnosed adjustment disorder with mixed features arising from plaintiff's sleep apnea. (Exhibit 7F). The physical examination conducted by Dr. Banner was essentially unremarkable. Dr. Banner diagnosed seizure disorder, sleep apnea and morbid obesity. (Exhibit 8F).

Dr. Peter Bertucci, a non-examining state agency physician, completed a physical residual functional capacity assessment on July 21, 2004. (Exhibit 9F). He concluded that plaintiff was generally capable of medium work, with some non-exertional limitations related to her seizure disorder and obesity. He concluded that she could stand and/or walk for a total of six hours in an eight-hour work day and sit for a total of about six hours in an eight-hour work day. (*Id.*). On July 20, 2004, Dr. Donald Hinton, a non-examining state agency psychologist, completed a mental residual functional capacity assessment and a psychiatric review technique form. He found that plaintiff's functional limitations were as follows: mild limitation in activities of daily living; mild limitation in maintaining social functioning; moderate limitation in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Exhibits 10F, 11F).

On August 2, 2005, Dr. Hassan Kesserwani diagnosed the plaintiff with complex partial seizures with and without secondary generalization. The plan was to titrate plaintiff's Topomax to 100 mg bid. (R. 346). An EEG ordered by Dr. Kesserwani on August 4, 2005,

was normal (R. 343). In December 2005, Dr. Hornsby completed a Medical Source Statement. He concluded that, during an eight-hour day, plaintiff could sit for eight hours and stand or walk for four hours. (Exhibit 15F). During February and March of 2007, plaintiff underwent laboratory testing ordered by Dr. Kesserwani. An MRI of the brain conducted on February 2, 2007 was normal. (Exhibit 17F). A lumbar spine MRI conducted on February 6, 2007 revealed an abnormal but nonspecific marrow signal which the radiologist noted could be seen with various anemia/chronic diseases and is not specific for metastatic disease. The MRI also revealed mild degenerative changes in the lumbar spine. (*Id.*). An x-ray of the lumbar spine conducted on March 9, 2007 revealed narrowing of the lower thoracic and upper lumbar intervertebral spaces and spur formation; otherwise, plaintiff had a normal lumbosacral spine. (*Id.*).

Dr. Kesserwani completed a medical source statement on March 16, 2007. He stated that plaintiff could sit for one hour and stand or walk for one hour during an eight-hour work day. (Exhibit 18F). He also completed a clinical assessment of pain on March 16, 2007, indicating that plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work. Physical activity such as walking, standing, sitting, bending, stooping, moving of extremities greatly increased pain and to such a degree as to cause distraction from task or total abandonment of task. Prescribed medication would be only mildly troublesome to the plaintiff and her ability to perform her work. (*Id.*).

Dr. J. Walker Jacobs conducted a consultative psychological examination of the plaintiff on January 30, 2008. He administered an MMPI-II. He noted that the "F" validity

scale was "extremely elevated," which "may represent frank psychosis, random responding or a deliberate attempt to exaggerate pathology. He noted that she "clearly was not psychotic" and that she was "consistent in her answers ruling out random responding." Thus, according to Dr. Jacobs, plaintiff's "F" validity scale may be viewed as a "fake bad" profile, also referred to as a "plea for help" profile. (Exhibit 20F).  Dr. Jacobs diagnosed panic disorder with agoraphobia, major depression, and breathing related sleep disorder. Based on plaintiff's MMPI II testing results, he concluded that she would have a "very poor prognosis." He completed a Medical Source Opinion Form, in which he concluded that plaintiff has "mild" limitations in: responding appropriately to supervisors and co-workers; using judgment in detailed or complex work-related decisions; and understanding, remembering, and carrying out simple, one and two-step instructions. He determined that plaintiff has "moderate" limitations in: responding appropriately to customers or other members of the general public; dealing with changes in a routine work setting; maintaining attention, concentration or pace for periods of at least two hours; and maintaining social functioning. (*Id.*).

On January 21, 2008, Dr. Madjid Keyvani, plaintiff's neurologist, saw the claimant for evaluation of seizure disorder. An MRI completed on January 30, 2008 showed inflammatory sinus changes, but otherwise no significant abnormality. (Exhibit 22F). During a follow-up appointment on March 3, 2008, plaintiff reported only one seizure since her last visit, which apparently occurred in her sleep. Dr. Keyvani's impression was possible complex partial seizure with secondary generalization, currently stable on Lamictal 100 mg

twice a day; nonepileptic event; anxiety and panic disorder; bipolar disorder; depression; and episodic migraine. The plan was to restart plaintiff on Topamax and continue with Lamictal. (*Id.*).

On February 11, 2008, Dr. William G. Watson conducted a consultative neurological examination by at the request of the state agency. Based on his medical examination, medical history provided by plaintiff, and review of medical evidence provided to him, his impression was seizures by history; low back pain (mild-moderate degenerative changes on x-ray without disk problems); obstructive sleep apnea; obesity; and polypharmacy. From a memory standpoint, there could be some memory impairment from her medications. However, she had a good recollection of her illness history over the past year and as recently as the past month. Dr. Watson also completed a medical source opinion (physical). He found that, from a neurological standpoint, plaintiff had no limitation in her ability to stand, walk or sit. He noted that obesity limits stamina; otherwise, he found no neurological findings to restrict plaintiff's activity. (Exhibit 21F).

At an administrative hearing conducted on April 24, 2008, plaintiff testified that she has sleep apnea; that she has a [C-Pap] machine; that she has it turned up to 15 and sleeps on a pillow with her back elevated. (R. 477). She reported that the machine does help her and, if she does not use it, she snores badly and wakes up feeling like she's choking. (*Id.*). Plaintiff reported pain in her lower back and hips. (R. 478). She explained that a doctor told her that she has three crushed vertebrae. (R. 479). She stated that the pain is constant and she rates the pain a seven on a scale of zero to ten. (*Id.*). Plaintiff testified that she can sit for a

maximum of 30 minutes, stand for 30 to 45 minutes, and that the pain is better if she can get up and down. (R. 480). She can walk for 15 to 20 minutes before she gets winded and has to stop. (*Id.*). She testified that she has problems using her hands for lifting and grasping or carrying things, especially her right hand, and that she could lift ten pounds, perhaps fifteen pounds, repetitively. (R. 481). When asked about the severity of her seizures, plaintiff testified that Dr. Prince put her on medication and it kept the seizures under control until she changed doctors; that the seizures started to get worse in 2003 and she changed doctors because they kept getting worse; that she changed to Dr. Kesserwani who put her on a different medication that did contain the seizures better; and that Dr. Kesserwani conducted extensive tests and the seizures kept getting worse. (R. 487-88). Plaintiff testified that, after Dr. Kesserwani kept increasing her medicine, she changed doctors again and went to Dr. Keyvani who put her on two medications; that she still has seizures; that it is something that she has to live with. (R. 488). Plaintiff testified that Dr. Elliot treats her for her back and that she takes one Lortab (10 mg) at night, and Advil during the day. (R. 488-89). Plaintiff testified that Dr. Elliot told her not to drive after she last tried to drive in December 2007 (R. 489-90).

## DISCUSSION

Plaintiff alleges that she is disabled and unable to work because of the combined effect of her seizures, sleep apnea, back problems, depression, morbid obesity, knee pain, migraine headaches, anxiety disorder, panic attacks, and agoraphobia. (Plaintiff's brief, pp. 1-2). Plaintiff challenges the Commissioner's decision, arguing that the ALJ erred in

8

assessing her residual functional capacity (RFC) by failing to: (1) perform a function-by-function analysis, citing relevant medical and nonmedical evidence as to each function when determining her exertional capacity; (2) consider symptoms related to plaintiff's obesity; (3) consider symptoms related to her seizures; (4) consider symptoms related to her mental health diagnosis; and (5) explain why he did not fully credit the opinions of plaintiff's two treating physicians. (Plaintiff's brief, pp. 1, 9).

*Plaintiff's Exertional Limitations*

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." (SSR 96-8p). When completing an RFC assessment, the adjudicator must discuss each conclusion and cite medical and nonmedical evidence supporting each conclusion. (*Id.*). Plaintiff argues that the ALJ is required to "include a narrative section describing how he arrived at his conclusion about each separate relevant function, citing medical and nonmedical evidence." (Plaintiff's brief, p. 8). Plaintiff continues, "[i]n particular, [the ALJ] did not describe how he arrived at his conclusion that Richardson 'has no limitation in her ability to stand, walk, or sit.'" (Plaintiff's brief, p. 9). Plaintiff's argument regarding the function-by-function analysis is intertwined with her contention that the ALJ did not state his reasons for failing to credit the opinions of her treating physicians fully. She argues, "[t]he same Social Security Ruling that requires separate determinations as to each function also provides that when an ALJ's decision conflicts with an opinion from a medical source, the ALJ must explain why

the opinion was not adopted, and opinions from treating physicians are entitled to special significance." (*Id.*).

In his decision, the ALJ discussed the testimony of plaintiff, her sister and the vocational expert. He included a detailed summary of plaintiff's medical history, noting her chief complaints, lab tests and results, frequency of medical treatment, and the opinions of various medical providers. (R. 18-33). The ALJ indicated that he gave significant weight to the opinion of Dr. William G. Watson, an examining neurologist, who concluded that "claimant has no limitation in stand, walk, or sit." (R. 28; *see also* Exhibit 21F). [1]

Plaintiff cites the medical source statement completed in December 2005 by "Dr. Hornsby, who has been plaintiff's treating physician since 2000 . . . conclud[ing]…that Richardson could walk for four hours, but that her ability to do that and other activities was

---

[1] The ALJ stated, "Dr. Watson specializes in neurology and his opinion is most consistent with the record as a whole." He summarized Dr. Watson's findings regarding plaintiff's exertional capacity:

> It was Dr. Watson's opinion that the claimant has no limitation in stand, walk or sit. However, her obesity will limit stamina; otherwise, no neurological findings to restrict activity. He found the claimant capable of occasionally lift and carry 10 to 15 pounds. He noted no upper body restrictions. He found the claimant capable of frequent push and pull with her arms and occasional push and pull with her legs. He found her capable of occasional climb, balance, stoop, kneel, crouch, crawl and reach overhead. He noted that she complained of back pain when she bent over. He found her capable of frequently handling, fingering and feeling, and constant talking and hearing. Dr. Watson further found that the claimant [was] capable of occasionally working in the following environments: extreme cold; extreme heat; wetness/humidity; vibration; exposure to fumes, noxious odors, dust, mists, gases or poor ventilation; and proximity to moving mechanical part[s]. Further, he totally restricted the claimant from working in high exposed places and driving automotive equipment.

(R. 28).

reduced by pain, which he described as moderately severe." (Plaintiff's brief, p. 9).[2] Plaintiff

further points to the opinion rendered by her treating neurologist, Dr. Kesserwani, in March

2007, that she suffers from moderately severe pain and can sit, stand and walk for only one

hour each.  (Exhibit 18F).[3]

"If a treating physician's opinion on the nature and severity of a claimant's

impairments is well-supported by medically acceptable clinical and laboratory diagnostic

techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ

must give it controlling weight." *Roth v. Astrue*, 249 Fed. Appx. 167, 168 (11th Cir.

2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)).  "If the treating physician's

opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must

be given substantial or considerable weight unless "good cause" is shown to the contrary.'"

---

[2] Plaintiff's present and previous attorneys, the ALJ, and the Commissioner's counsel have all referred to this medical source opinion (MSO) as that of Dr. Hornsby.  (R. 326-27; Plaintiff's brief, p. 9; Commissioner's brief, p. 9).  However, the medical source statement was completed and signed by Kelli McAllister, CRNP.  (See R. 329).  Although McAllister printed Dr. Hornsby's name on the form, Dr. Hornsby did not sign the form.  (*Id.*).  Accordingly, the December 2005 opinion is that of nurse McAllister, not that of Dr. Hornsby. There is nothing in Dr. Hornsby's treatment notes to indicate that CRNP McAllister ever treated the plaintiff.  (See Exhibits 1F, 14F).  Plaintiff sought treatment from Dr. Hornsby's office between August 2004 and March 2005 for complaints of back pain; his typed name appears at the bottom of most of the treatment notes.  (Exhibit 14F).  On the last visit in which plaintiff complained to him of back pain, he restricted her to rest for one to three days, "light duty" thereafter for one week, "*not lifting over 30 pounds for one week*."  (R. 323, March 16, 2005 treatment note)(emphasis added). There are no treatment notes evidencing treatment by either Dr. Hornsby or CRNP McAllister between July 2005 and December 2005. The restriction imposed by Dr. Hornsby in March 2005 conflicts with the lifting limitation of five pounds frequently and ten pounds occasionally which appears in nurse McAllister's MSO, signed in December 2005, and in which McAllister indicated that plaintiff had been functioning at this level for "2 yrs." (R. 329).  Nurse McAllister, like Dr. Watson, concluded that plaintiff is capable of sitting for eight hours during an 8-hour workday.  (Exhibit 15F).

[3] Dr. Kesserwani actually circled both "moderate" and "moderately severe," indicating that he believed her pain to be moderate to moderately-severe.  (R. 363).

*Id.* (citing *Crawford v. Commissioner*, 363 F .3d 1155, 1159 (11th Cir. 2004)).  The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'" *Crawford*, *supra* (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir.1991)).  Additionally, there is good cause where the treating physicians' opinions are "inconsistent with their own medical records," *Roth*, supra (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints of pain." *Freeman v. Barnhart*, 220 Fed. Appx. 957, 960 (11th Cir. 2007)(citing *Crawford*, supra).

"If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." *Pritchett v. Commissioner, Social Security Admin*, 315 Fed. Appx. 806, 810 (11th Cir. 2009)(unpublished opinion)(citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Schuhardt v. Astrue*, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The ALJ articulated his reasons for not according controlling or substantial weight to the RFC opinions of plaintiff's "treating physicians."  He stated, "[t]heir opinions contain insufficient rationale with no citation to medical evidence that would reasonably support the

opinions in that document, and their opinions are inconsistent with the record as a whole and the claimant's history of medical treatment." (R. 29).  Both MSOs attributed the plaintiff's pain to degenerative disc disease; Dr. Kesserwani indicated that plaintiff's pain also resulted from her obesity. The ALJ stated the following regarding the plaintiff's back pain:

> The [ALJ] finds it significant that diagnostic imaging has shown narrowing of the lower thoracic and upper lumbar intervertebral spaces and spur formation; otherwise, normal lumbosacral spine and mild chronic (L) lumbar spine radiculopathy. The claimant has been found free of acute or chronic vertebrogenic disorders, such as disc herniation, nerve root impingement, spinal stenosis, or facet joint hypertrophy. The claimant, further, has not been observed to have ongoing neurological deficits in the upper or lower extremities, such as reflex and sensory abnormalities, motor incoordination, or decreased muscle strength. Finally, no joint deformities, gait abnormalities, muscle atrophy, substantial limitation of range of motion, or significant spasm have been documented in the record.

(R. 30-31). Dr. Hornsby's and Dr. Kesserwani's treatment notes do not contain significant objective findings regarding plaintiff's back impairment, nor do they indicate that either doctor imposed any long-term functional restrictions on the plaintiff or previously identified any functional limitations.  Thus, their own treatment notes provide substantial evidence in support of the ALJ's observation that the limitations expressed in the MSO forms are not supported by the medical evidence of record.[4] The reasons articulated by the ALJ for rejecting the opinions expressed in the medical source statement completed by CRNP McAllister and the clinical assessment of pain completed by Dr. Kesserwani are adequate

---

[4] At the March 16, 2005 office visit in which Dr. Hornsby imposed the limitation of rest for a few days and light duty for a week thereafter, the note indicated that he instructed plaintiff to return to the clinic in one month and to notify the doctor immediately if symptoms did not improve or worsened. (R. 323).  The next treatment note is dated June 16, 2005, three months later, with an assessment of foot pain. (R. 324). There are no functional restrictions or limitations noted in Dr. Kesserwani's treatment notes dated July 2, 2005, to February 5, 2007. (R. 338-360).

and supported by substantial evidence. Accordingly, the ALJ did not err by assigning the opinions little weight and otherwise finding them unpersuasive.[5]

Returning to the requirement for a function-by-function assessment, the fact that the ALJ did not include separate sections of discussion with headings for each function is not determinative of whether he performed a function-by-function assessment. The ALJ discussed the various opinions of medical sources who provided function-by-function assessments of plaintiff's ability to perform work activities, along with the remainder of the plaintiff's medical record. (R. 21-27). The ALJ's decision could have been better organized. However, upon review of his decision as a whole, it is apparent to the court that the ALJ reached his findings regarding plaintiff's exertional limitations only after he considered the evidence and drew his own conclusions regarding plaintiff's abilities on a function-by-function basis. Accordingly, his analysis sufficiently complies with SSR 96-8p. (*See Freeman v. Barnhart*, 200 Fed. Appx. 957, 960 (11th Cir. 2007)("[T]he ALJ complied with SSR 96-8p by considering [the plaintiff's] functional limitations and restrictions and, only

---

[5] CRNP McAllister is not an acceptable medical source for purposes of establishing plaintiff's medically determinable impairments; however, if she actually treated the plaintiff, her opinion regarding plaintiff's limitations would be entitled to consideration as an "other source" pursuant to 20 C.F.R. § 416.913(d), § 404.1513(d). As noted previously, there is no indication in the record that McAllister ever treated the plaintiff. (See Exhibit 1F, 14F; see also 20 C.F.R. § 404.1527(d)(2)(i)("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source."). Even if McAllister actually treated the plaintiff, the ALJ articulated good cause for discounting her opinion.

after he found none, proceeding to express her residual functional limitations in terms of exertional levels.").

*Consideration of Symptoms Resulting from Obesity*

Social Security Ruling 02-1p states, "When we identify obesity as a medically determinable impairment, we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify." Plaintiff cites Dr. Watson's statement that plaintiff's "obesity most probably is the main cause of her obstructive sleep apnea" and that the "lack of sleep may also impair memory and may also aggravate seizures." (Plaintiff's brief, p. 11; R. 376). Plaintiff also points to Dr. McKeown's June 7, 2004 opinion, arguing that he found that her sleep apnea "led to Adjustment Disorder with mixed features resulting in significant limitations."[6] (Plaintiff's brief, p. 11). Thus, plaintiff identifies sleep apnea

---

[6] Dr. McKeown did find that plaintiff "does appear to have some difficulties associated with adjustment as a result of her severe sleep disorder" and he diagnosed adjustment disorder with mixed features. (R. 279). However, although he noted that plaintiff reported that her sleep dysfunction affects her memory and concentration, as well as her stamina, he observed that there "appear[ed] to be no gross deterioration with regard to general memory and no indication of current symptoms associated with anxiety or depression." (*Id.*). He then stated, "For her sleep disturbance and associated medical problems she demonstrates some significant limitations. For her mental health related issues, she demonstrates a fair to good prognosis." (R. 280). It is not at all clear that Dr. McKeown believed that plaintiff's *adjustment disorder* resulted in "significant limitations," as argued by the plaintiff. (*See id.*). As to plaintiff's mental limitations, the ALJ indicated that he gave significant weight to the July 20, 2004 opinion of Dr. Donald E. Hinton "because his finding is most consistent with the record as a whole and the claimant's history of mental health treatment." (R. 28). He stated:

> [D]r. Hinton found the claimant to have mild limitations in restriction of activities of daily living and difficulties in maintaining social functioning; moderate limitations in difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. He further found that the claimant is moderately limited in her

as the obesity-related cause of alleged limitations, including mental limitations, in her
functioning.

The ALJ addressed plaintiff's sleep apnea, stating, "[a]lthough claimant has alleged
continued problems with sleep apnea, the undersigned finds it significant that the claimant
has not sought additional treatment from Dr. Prince or undergone additional reevaluation of
her C-Pap since October 2003." (R. 30). He continued:

> The claimant reported to consulting psychologist Dr. McKeown a severe sleep
> dysfunction which affected her memory and concentration as well as her
> stamina. However, Dr. McKeown reported that there appeared to be no gross
> deterioration with regard to general memory and no indication of current
> symptoms associated with anxiety or depression. There was no major thought
> disturbance noted. Although Dr. McKeown suggested that she contact her
> medical professionals for updated information and treatment for her sleep
> disorder, there is no indication that she followed his recommendation."

(*Id.*). Dr. McKeown concluded plaintiff's sleep disorder was likely the "overriding
contributor to any other mental health related symptoms and issues she may have." (R. 280).

---

> ability to understand and remember detailed instructions; her ability to carry out
> detailed instructions; and her ability to maintain attention and concentration for
> extended periods of time. It was his opinion that she is able to understand, remember
> and carry out short and simple instructions. She can attend for two hour periods.

(*Id.*). Dr. Hinton's conclusions are not inconsistent with Dr. McKeown's opinions. Plaintiff
submitted records demonstrating that, on October 23, 2007, more than three years after her
evaluation by Dr. McKeown, she sought mental health counseling at Southeastern Psychological
Counseling Services. (R. 397-400). The intake note indicates no previous history of counseling.
(R. 398). Plaintiff received individual counseling on December 18, 2007 and January 29, 2008; the
treatment provider's signature is illegible and his or her qualifications are not indicated in the record.
However, there is nothing in the counseling notes which impeaches the ALJ's conclusion. (See
Exhibit 23F).

16

Notably, plaintiff testified at the administrative hearing that the C-Pap machine, used to treat her sleep apnea, does help. (R. 477).

The ALJ  stated, "the record fails to contain a credible opinion that the claimant's obesity has increased the severity of her impairments to the extent that additional and significant limitations have resulted." (R. 31). He observed that "no credible physician has outlined any specific limitations of function as a result of the claimant's diagnosed obesity. There is evidence that the claimant was obese prior to her alleged onset of disability. Therefore, [her] obesity is a longstanding problem with which [s]he has successfully worked in the past without significant difficulty." (*Id.*).[7]

---

[7] Plaintiff argues, "Dr. Watson determined that in addition to causing sleep apnea, obesity limited [plaintiff's] ability to walk, stand, and sit. [H]e added under 'clinical findings,' that obesity would limit [plaintiff's] stamina." (Plaintiff's brief, p. 11).  As plaintiff notes, Dr. Watson found no neurological symptoms which would limit plaintiff's ability to walk, stand or sit; during his examination of the plaintiff, he did not observe any difficulties in walking, standing or sitting. (R. 378).  Regarding obesity, Dr. Watson stated:

> She is significantly overweight.... She sits in the chair in essentially the same position for the entire history and for the portion of the exam that will allow sitting. When asked to walk across the room, she has no difficulty arising from the chair. Her gait across the room is unencumbered. She turns around without difficulty. Heel walking, toe walking, and tandem walking are acceptably performed."

(R. 375). He also noted:

> There is history related to degenerative changes on lower spine x-rays but based on her sitting position in the chair and her ability to rise and walk across the room and sit back down without any evidence of discomfort, hers is not a picture of one with significant degenerative disc disease.

(R. 376).  Dr. Watson did note that plaintiff's obesity would limit her stamina, but he did not translate this vague observation into a specific durational limitation on standing, walking, or sitting. (*See* R. 378).  The Commissioner argues that "no physician's contemporaneous treatment notes reflect any functional limitations resulting from [p]laintiff's obesity that were any more restrictive than the limitations the ALJ assessed." (Commissioner's brief, p. 10). The same is true of Dr.

Considering the opinions of Drs. Watson, Hinton, and McKeown, the plaintiff's own testimony, and the ALJ's discussion of plaintiff's obesity, mental health diagnosis, and sleep apnea, this court finds the ALJ assessed plaintiff's obesity and obesity-related limitations properly in determining her RFC.

*Consideration of Symptoms Resulting from Seizures*

The ALJ noted in his decision, "although the evidence indicates that the claimant has been diagnosed with a seizure disorder, the record suggests that the frequency, duration, and sequelae of the claimant's episodes are minimized and the condition is controlled when her medication levels are regularly monitored and she takes her medications as prescribed." (R. 30). Plaintiff argues that, "despite changes in medications and changes in neurologists from Dr. Prince to Dr. Kesserwani to Dr. Keyvani, [her] seizures have continued." (Plaintiff's brief, p. 13).

In support of his conclusion, the ALJ relied on: (1) "[m]edical records dated January 16, 2007, from First Med of Dothan [which] document that the claimant stated that she had been having problems with seizures off and on, but they had not been severe[;]" (2) Dr. Watson's February 11, 2008 conclusion that, "based on the history from the claimant, the claimant's physician at the University of Alabama must have felt that she had nonepileptic events if they recommended her staying off seizure medication despite a 16 year history of

---

Watson's observation about plaintiff's stamina. While his note indicates that plaintiff's obesity will limit her stamina, Dr. Watson did not express any opinion regarding *how* limited she is in any of these functions. Simply put, no doctor has explained exactly how plaintiff's decreased stamina affects her ability to perform specific work-related functions. As noted above, the ALJ observed that plaintiff "successfully worked in the past" while obese. (R. 31).

being treated for seizures[;]" (3) EEG and MRI results showing no significant abnormalities. (R. 29).

The Commissioner argues that, "[n]otably, no treating physician in their contemporaneous notes placed any functional limitations on [p]laintiff due to her seizure disorder." (Commissioner's brief, p. 11). This is not entirely correct. Dr. Elliot, who first treated plaintiff on January 18, 2008, suggested that plaintiff stop driving due to her reports of seizures. (Exhibit 24F; *see also* R. 489-90). As the ALJ observed, however (R. 31), when Dr. Jacobs evaluated plaintiff two weeks later, on January 30, 2008, plaintiff reported that she continued to drive an automobile. (R. 371). The ALJ's RFC assessment, nevertheless, includes a restriction from driving automotive equipment and, also, from working around high, exposed places. (R. 19). The ALJ properly considered the plaintiff's symptoms related to seizures, and substantial evidence supports his conclusion that plaintiff's statements regarding the limiting effects of seizures are not credible to the extent they are inconsistent with his conclusion regarding her RFC.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, this decision is due to be affirmed. A separate judgement will be entered.

Done, this 30th day of September, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

19